is in Ray Petrobras. Thank you. Everybody got room? Sure, but wait for, or take a moment. We're going to sort of let things clear out and so we can give you our full attention. No, that's fine. I sympathize, having done that before. Good morning, all. Good morning, Your Honors. May it please the Court, my name is Jay Kasner and I am here on behalf of the Underwriter Defendant's Appellants. If it pleases the Court, I will address the ascertainability issues raised by Judge Rakoff's class certification ruling. My friend, Mr. Petrobras' appellants will address any separate issues, if it pleases the Court, relating to predominance and superiority, and will also address the fraud on the market theory as it related to the 10B5 class certification decision. The decision by the District Court was unprecedented in this circuit. Judge Rakoff certified a issued by Petrobras, a massive Brazilian majority state-owned company, with investors around the globe. The securities at issue never traded on a United States exchange. Rather, following the underwritten offering, they were purchased and sold by buyers and sellers from all over the world in over-the-counter and other transactions. Because of the overwhelming foreign nature of this matter, and in light of the Morrison decision of the Supreme Court and this Court's jurisprudence in Absolute Activist, Pontiac v. UBS, Orachenko, and most recently the opinion penned by Judge Livingston in Vivendi, Judge Livingston referred to purchasers of notes, quote, in domestic transactions. That was both legal and factual error. In domestic transactions — Would that be error in any case in which you're talking about debt securities of a foreign company with regard to over-the-counter aftermarkets? Judge Livingston, we are not urging the Court to sweep that broadly. It is a fact-based decision depending upon the record before the judge. Here — Yes, help me understand the record. Sure. Here, there was no record, Your Honor. That's the problem. The ascertainability component, as the Court is aware, has two prongs. Is it administratively feasible to decide who's in and who's out? And does the who's in, who's out determination require a mini-hearing? Judge Rakoff did not address the mini-hearing point at all in his opinion. Focusing solely on the ascertainability piece, can I, Judge Rakoff, can a claims administrator or can class members decide who's in and who's out? There was no record submitted on that point by our friends who bore the burden of proof. Instead, Judge Rakoff substituted essentially a presumption. And in his opinion, he speculated that it is, quote, highly likely, close quote, that such documentation would exist that would allow somebody, whoever that somebody would be, to determine whether the thousands and thousands and thousands of investors who are putative class members engaged in a, quote, domestic transaction. Don't they have to make that showing in order to actually then participate in the class? I mean, you're going to send out notice to everybody who's arguably swept into the, into the designation, and then they have to come back with some showing that they actually fit. Judge Hall, there are a couple of answers to that. In opinions by Judge Livingston, again in the Vivendi case, and Judge Garifuss's decision in the Firefighters Vulcan case, both of them rec- Is the odd person out here? Your Honor, the IPO case that Your Honor was on the panel for also references this, although not as explicitly. But the reason I reference those authorities is, the name of the game is, do I know going in as a class member if I'm in the class? Imagine hypothetically you were an investor sitting in Buenos Aires having purchased these notes. You get something in the mail that says you are a member of a class if you engaged, quote, in a domestic transaction. Well, with all due respect, that issue has been a knotty one for the courts in the United States since Morrison, delineating what that means. It's a fortiori for an investor looking at in-domestic transactions. There was no evidence at all in the record indicating how they would make that decision. And indeed, Your Honors, we sought discovery after the class certification decision came down from the plaintiff class, tell us who did you buy from, where did you buy? The plaintiffs resisted that on the grounds that it was very, very difficult and could take north of six months per investor to find that information. Judge Hall, to your question, well, why can't it wait until the end as well? There's a little bit of a deja vu here from the argument of my friends in the prior case. Class members are entitled to know up front, are you in or are you out? The defendants are entitled to know, are they in or are they out? And again, with respect, Judge Hall, Judge Livingston in the Vivendi case and Judge Gariffas in the Vulcan case both recognized. I see that the red light is on. May I finish? We're going to be somewhat loose with that. So if you want to go ahead and both sides will be treated equally. So thank you. Just an important matter. Just to finish the thought, your honors have made clear and the jurisprudence behind ascertainability has made clear. Defendants are entitled to know now who's in and who's out. Imagine the precedent that this court would be setting if you permitted a case such as this with a foreign company, with investors all over the world, with billions of dollars of securities trading all over the world, and because an investor, and Judge Rakoff, to be clear, and the record is clear, Judge Rakoff analyzed four investors, or five, excuse me, as to whether they were domestic purchasers, where they incurred irrevocable liability, five of them. Two of them, he said, were okay because they had bought in the IPO, but all of the contracts, with proof in the motion to dismiss context, with over-the-counter transactions, not a single one of them were able to demonstrate that they had incurred irrevocable liability in the United States. So for us, on the defense side, we are entitled to know now what are the parameters. He was supposed to have taken evidence. What are the parameters? And if I may, your honors, just so that in case you wish to go back and review the record on this, those slips reflecting information that Judge Rakoff couldn't conclude constituted domestic transactions appear at A3040, A3087, 3085, and 3086. And just for an abundance of candor, the two that he found, excuse me, the one that he found, well, there were two of them, but the one I'm looking at appears at A3045, which your honors would recognize as a bit more of a routine, garden-variety, confirmation-type slip. The others that I've mentioned do not. Judge, if I may, just 30 more seconds as to why, as a matter of policy, what Judge Rakoff did, particularly in the absence of any evidentiary record, is so dangerous as a policy matter. This Court is fully familiar with what Congress, as interpreted by the Court, which have also been applied to the 33 Act claims. And this Court's decisions on Morrison have been animated routinely by interests of comedy and respect for international jurisdictions and law. I would commend to the Court the amicus briefs submitted by the European Business Association and the Brazilian Business Association, which lay out how, if they were required, as here, a Brazilian company, all over the world's securities, but because two investors were able to demonstrate that they engaged in a domestic transaction. We have folks here from Rio that are watching these proceedings on behalf of the company. Imagine that just on that basis, with investors, thousands of them, all over the world, they won't know until the end of the case in your scenario, Judge Hall, how much their exposure is. To paraphrase the Supreme Court, an absolute activist, it would be a craven watchdog indeed if the extraterritorial provisions were to retreat simply because a single investor was able to demonstrate a domestic transaction. So is the argument that the District Court, because of Morrison, is under some obligation to not rely on simply assumptions in any case, but to have some sort of evidentiary showing about how many domestic, some ability to estimate the size of the class and come up with some rule that would say who's in and who's out? Because class members don't have to be identified at this stage. That's correct, Your Honor, number one. We're not urging, and there's some suggestion in the brief of my friends on the other side, that we're asking that the class member be ascertained as opposed to ascertainable or identified as opposed to identifiable. That's not the case. What we are urging here, they could have come forward. The legal standards in this case were clear. This is not like absolute activists where this Court sent the case back to Judge Daniels, which was not a class action, by the way. That is a reference in the appellee's brief that absolute activist was a class action. That is not correct. But it isn't a situation where the law was somehow uncertain. The law has been settled as to what a domestic transaction has been for a number of years now. So our friends on the other side who were highly capable counsel could have put forth before Judge Rakoff an evidentiary record. They made a, and in fact, Judge Livingston, on the motion to dismiss portion relating to the Morrison issues, which Judge Rakoff was actually quite indulgent with the plaintiff's appellees. He gave them four shots to get it right. They submitted an affidavit before Judge Rakoff on the motion to dismiss. They submitted expert testimony on the basic issue that my friend, Mr. Lyman, will address. Thank you, Mr. Haslund. Thank you. Sorry, Judge Fallin. I hope I wasn't oversimplifying. Well, it's a long 30 seconds, but... I appreciate your indulgence. We understand Judge Livingston had a question. So why don't we get a little more, I will get a little more realistic, and why don't we give you 10 minutes and Mr. Lieberman count on 20 and you'll be able to go over the red light as well. We'll try to put a little order in this, but we're interested, obviously, in trying to get these right. So, Mr. Lyman, good morning. Thank you, Your Honors. My name is Louis Lyman. May it please the Court that I represent the Petrobras defendants. I propose to address first the HAL burden and basic issues, and then to touch on the predominance issues, which provide a separate and independent basis for reversal with respect to the Morrison issues. Quite simply, Your Honors, with respect to the basic issue, the District Court committed error of law by relieving the plaintiffs of any burden of having to show empiric evidence of a cause and effect relationship between news and a directionally appropriate movement in the stock price. In essence, what Judge Rakoff did and what he held was that because this Court in Bombardier and in other cases had not previously reversed the District Court for the failure to require empiric evidence, the District Court and courts throughout the circuit are free to certify classes without any empiric evidence whatsoever, showing that there is a relationship between news and a directionally appropriate movement in the stock price. That's error of law. And your position is that the record is devoid of that? Your Honor, our position is that Judge Rakoff's rulings make clear that there is no evidence of directionality. He didn't accept evidence of directionality, and the record wouldn't support it. Specifically, Judge Rakoff noted in his opinion that the novel FDT test relied on by the plaintiffs did not show directionality, that their experts acknowledged that. And then he noted that once we challenged that. Making sure I understand. It wasn't designed to show directionality. It was never going to show directionality. That's correct, Your Honor. It was different from what Your Honor has described in the Vivendi case, the standard operating procedure of an event study that shows when there's good news, the stock price goes up. Bad news, the stock price goes down. The test that they used was one that simply showed that when a company released information, it was more likely than not, regardless of whether the information was stale, it was more likely that the stock would react than in circumstances where the company didn't release information. It didn't test whether the stock reacted in the wrong way, and in fact the record demonstrates that the securities here reacted in the wrong way in a number of instances. It also didn't rely upon whether the news was in fact news and permitted sort of a finding of efficiency, even if, as the record demonstrated, the news was, the market reacted to stale news. Would it be enough in certain circumstances just to demonstrate that there was tremendous volatility that resulted from the news in a situation where you have a worldwide corporation with investors on four continents? Why do you need directionality in every instance? You need directionality, Your Honor, because that's the heart, that's the foundation of the basic test and the Halliburton test. It's the foundation, frankly, also of Bombardier. The test says that in order to replace the ordinary way of proving reliance, you can do it by saying that an investor relied upon the stock price, but you have to show that the price reflected the news, that the news was impounded. What Halliburton 2 says is that the fraud was transmitted through the market price, and what Bombardier says is that the market has to integrate information about the security into the price. The fact that the stock moves without any showing that it moves in the right way wouldn't permit a inference, just the inference doesn't follow from those facts that reliance on price means reliance upon the misrepresentation, and that, Your Honor, is the fundamental legal error in Judge Rakoff's opinion. He said on S.P.A. 32, I think, that the key to basic was not a showing that the price moved in the right way, but simply a showing that the price moved. That was legal error. Let me also address ... Yes, can you just point out a little bit, why is that taking weak evidence of movement, maybe some weak evidence of directionality, in conjunction with the indirect factors, which you find in his analysis? Let me address that, Your Honor. First of all, with respect to the actual findings and determination by Judge Rakoff, what he said about directionality and what the record demonstrates is that the expert did a post hoc analysis. There were two instances which we were permitted to challenge with respect to that post hoc analysis. In both instances, the court found that the security didn't move in the right direction. Then he said, in his opinion, he can't tell whether those two instances are an anomaly or evidence of something more widespread. In other words, he couldn't make a finding with respect to directionality. He wasn't just that there was ... With respect to the other KAMR factors, the record makes clear, both as a matter of fact and as a matter of law, that those factors, KAMR 1 through 4, do not demonstrate market efficiency. There's no expert evidence that shows that those factors demonstrate market efficiency. From a legal perspective, there's no legal standard that he enunciated or the courts have enunciated or that could be applied with respect to those factors. What Bombardier says, and I think correctly, is that the essence of an efficient market is the cause and effect, empiric evidence, of a cause and effect relationship. We were not asking for the plaintiffs or the district court to require something extraordinary. What we were asking be done in this case is what's done routinely in cases in the Southern District, is empiric evidence showing a cause and effect relationship. Let me just touch on a few of the other points that the plaintiffs make in their opposition. First they say, and Judge Rakoff stated, that empiric evidence wasn't required because it's common sense that the stock and all of the securities traded efficiently and that it would be implausible to assume that they don't. But we're in a court of law that requires evidence and legal standards, and it's not sufficient to just say it's common sense. The law requires, in Ray IPO, requires evidence. Bombardier requires a finding by a preponderance. They say that Halliburton II didn't require a perfect ex-ante prediction. Judge Rakoff said it didn't require a perfect ex-ante prediction of magnitude, direction, and correctness of the price reactions, and said that the market could be irrational. Well, that's a misquote of Halliburton II. What Halliburton II said is that the experts need not show that the price reaction is perfectly accurate in the perfect degree. They also said, well, there was a model. It used regression. Well, it's not enough that there be a model or that it used regression. It needs to test for the right things. It didn't test for the right things here. And finally, and importantly, they say that, well, to use the conventional test would lead to defendants challenging the experts' view with respect to tenure. Well, frankly, that also gets to the heart of the matter, because they could have done the test, and the law doesn't permit them to avoid doing the test by simply using a new test that doesn't test for what's important. Let me address just briefly, while the yellow light is on, the issues with respect to predominance. As you know, Judge Rakoff didn't make a finding with respect to predominance. He simply ignored the issue which was raised. There's no dispute, and there was no dispute below from the plaintiffs that the individualized issues—I see the red light is on. Can I continue for 30 more seconds? Yeah, but this is a real 30 seconds. Okay. Quick few points. Number one, this is not like a municipal bond situation where there might be common proof. The record demonstrates that there are numerous individualized issues. It's a security that trades worldwide with news worldwide from a foreign company. Number two, we've got a due process right to challenge the allegations with respect to— Could you go up and be a little slower on point number one? Point number one is that what the record shows here is that this is a security of a foreign issuer that's traded worldwide with news that is disseminated worldwide about it with holders and purchasers who are in countries from the United Arab Emirates and Hong Kong to Europe to Latin America, in all four continents. It's a security that is—the facts show it's traded worldwide. Number two, we've got a due process right to challenge the Morrison issues. It infects everybody, and it's not a circumstance in which, as it appears in many cases, where the evidence to challenge that would either be in the possession of the plaintiffs or the defendants by their own admission. Those questions need to be addressed through discovery of third parties. Each claim is likely to be substantial on its own. We're talking about securities with a par value in the minimum amount. It's $1,000, 1,000 euros. The claims here, each individually could be substantial. And finally, Your Honors, this is a case where Judge Rakoff has already held that it has evolved to something other than primarily a class action. He's managing 500 individual plaintiffs who are opting out. That would permit us to exercise our due process rights. Thank you. Thank you, Mr. Lyman. And, Mr. Kasner and Mr. Lyman, you've both reserved some time for rebuttal, so— Thank you, Your Honor. And good morning. May it please the Court. I think what's really missing from defendants' presentation on the record is there was ample more evidence brought to Judge Rakoff with respect to Morrison determinations. What defendants didn't raise is that we have over 500 plaintiffs with tens of thousands of secondary market transactions on the bonds. Of those, defendants chose to dispute a very small minority of those on Morrison grounds. And let's look at how those disputes went. There was an omnibus motion to dismiss, and we note this in the record on footnote six of our brief. On that omnibus motion to dismiss included New York City pensions, Ohio pensions, Skagen, Transamerica. On the first try, when really plaintiffs were working on a notice pleading, so they didn't provide specific information, Judge Rakoff granted defendants' motion to dismiss. Thereafter, he said there was not enough specificity. You have another chance to do it. Plaintiffs then submitted a very robust record. They submitted information showing where the broker-dealer was located and where the defendant and counterparty was located. They provided this ample detail on secondary market purchases. And what occurred was defendants didn't even challenge those transactions. So we've got a wide swath of transactions, tens of thousands. Defendants, they're saying this is so hard and so difficult, and these are very aggressive litigators here. They didn't even choose to dispute those. One other opt-out case was 600 transactions. Of those in dispute, only 190 transactions. And in those, Judge Rakoff held that those, they did not sufficiently plead marcin. In our other plaintiffs, the named plaintiffs, it was held that two were able to and two were not. There's a clear record here. Judge Rakoff can call bulls and strikes on marcin very easily and very rapidly. What defendants would do, though, the way they would define a class, they would define no class. It would be impossible to have any domestic transactions whatsoever because there may be some problems in making these determinations. The question is, where is a record on the difficulty of making determinations? Judge Rakoff has an ample record with tens of thousands of transactions. He's made these determinations very quickly. Defendants could dispute these transactions. You could dispute a determination in any litigation. That doesn't mean it's wrong and it doesn't mean it's not determinable. Very importantly... How does the record reflect, when is it contemplated that these determinations are going to be made and how? Do we have any idea? There would be, just like in any class action, at the judgments, there would be a claims administration process, just like it is in every transaction, where it's determined whether or not a potential class member is indeed a class member and if he's been damaged. This is the same process that goes forth in every class action throughout the country. And what about your adversary's argument that it becomes very hard for the defendants to talk about settlement without some more understanding of how many domestic transactions may be a part of this class? Your Honor, it's very easy for the defendants to make this determination. If we look at the public filings, the 13 Fs, it's very easy to see who are the investment managers and institutions holding Petrobras securities. What actually we do see from the record is, in many securities, over 70% were U.S. institutional investors. Defendants can take a rough estimate from that and see whether or not these were domestic investors or not domestic investors. Defendants are making payments through the depository trust corporation to these investors. They know where the payments are going. They can get from the broker-dealers records. And so to say defendants have to make a settlement determination, first of all, we don't see that in the law where defendants have that right. The Tyson case was very on point to this. In the Tyson case, there was a $6.7 million estimate of damages by the expert based on statistical analyses. That was reduced, and they covered two categories of plaintiffs, those in the kill department, those in the fabrication department. That award was reduced to $2.9 million. And the question was, we don't know how it's been reduced. And based on that, you don't know who is a damaged class member or not. Justice Roberts, in his concurrence, said, I have very big concerns as to whether or not we're going to be able to ascertain who is a damaged class member and who is not. And he said, it seems like from the record it's contradicted. I think it's likely we'll never have an ability. Despite that concern, the class went certified. And so clearly, there's a situation where the Supreme Court was faced with a scenario where they said, hey, we may never be able to figure this out. Yet, the class went certified. Here, it is possible to figure it out. We're dealing with very sophisticated institutions who have been making bond payments to investors over decades. They can figure out who they are. Actually, from the record, it's a limited number of class members here. With respect to the stocks, the ADSs, there are potentially millions. The institutional investors in the bonds are somewhat more limited. Defendants can figure out who is domestic and who is not. And they can make a rough estimate of their damages. In any class action, at any point, you always have this scenario. There's questions on class actions. There are class definitions that are set by those who purchased the securities in the relevant company and were damaged thereby. Who knows what in damage thereby means? Is it done by LIFO, by FIFO, NetNet? As this court held in China North, the court has broad discretion in making damages and terminations. Yet, those classes go certified each and every time. And really, actually, defendants are ultimately arguing, with respect to absolute activists, Morrison had endeavored, and we believe successfully so, to set forth a clear, bright line rule. Absolute activists adopted that rule and called it a clear and direct test. And so what defendants are ultimately arguing is absolute activists so failed to conduct a clear and direct test that it's actually so convoluted, we can never have a class certified on this issue. And I think it's interesting what defendants argue, that, well, we're not saying for all over-the-counter bonds, because they would never say that, because as SIFMA noted in ultimately over-the-counter, this is only because Petrobras is a foreign corporation. The question is, under Morrison, what does it matter, the location and the place of incorporation of the issuer? That's irrelevant under Morrison. The question is whether or not the securities and securities transactions were domestic. The class certification order tests that very issue. And specifically... Your argument is that in a case in which everyone going in could, with some degree of confidence, say there might end up being only a handful of... There might only be a handful of domestic transactions at the end of the day. Most of these end up being a foreign investor and foreign transactions that we still must certify the class and wait until the end of the litigation to ascertain? Fair enough, Your Honor. And we would say the case here is much more distinct. Petrobras here listed these notes only on one exchange, the New York Stock Exchange. They purposefully registered these securities only in one country, the United States. And when they made their offering, they made them only in one country. Payments would be made in one country, in New York. The offerings applied only to one state, in New York. They purposefully used the markets of the United States to sell these securities. And there's a reason why companies actually use a depository trust corporation to register their securities. You get access then to the broker-dealers who then can sell these securities to the U.S. markets. Petrobras is ultimately saying is, hey, we'd like to come, sell our notes through New York, list our notes through New York, make filings on 20Fs and 6Ks throughout the class period, but we can never have a class certified here because we're foreign. That's what defendants would like. I don't think Morrison in any way countenances that result. And I think it's worth reminding is that obviously everyone knows here that we're looking at an abuse of discretion standard. And particularly when it comes to manageability, that's peculiarly within the discretion of the district court. So defendants have a very, very high mountain to climb here, and they fail to make even a step in showing that Judge Rakoff here abuses discretion. If there are any further questions on ascertainability, I'd, you know, we, well, I could just, we could just make another point, Your Honors, is that typically in these transactions and over-the-counter, where we know over 95% were institutional investors, there's going to be X amount of ways that this transaction is going to occur. It's going to occur by the plaintiff, either through its own in-house investment manager or through an investment manager they hire out. There'll be broker-dealers. That broker-dealer is either located in the United States or it's not. And there's a counsel party, either he's located in the United States. There's about, really here, three factors, four factors, you could multiply them by two, six to eight factors. It's possible for Judge Rakoff to determine on each of those factors whether they in combination succeed in defying domesticity or they do not. And so to say this is some sprawling question with absolutely no guidance, really I think actually does a disservice to Morrison, does a disservice to this Court an absolute activist. And the Court in U.S. v. Giorgio adopted Morrison and agreed this is a simple and direct test. And that's why defendants on their own, when they were arguing a motion to dismiss, they said Morrison irrevocable liability can be easily determined based on recognized and readily understood standards. What that means is it's ascertainable. There's no other way. If we look up ascertainability in the dictionary, it would sound very much like easily determined based on readily recognized standards. Defendants had that own statement in the record. One other issue that has come up as far as the briefing has gone, Your Honors, is the issue regarding the Depository Trust Corporation. This issue came up in the briefing on the motion to dismiss. We had argued that that is sufficient to allege a domestic transaction. Judge Rakoff disagreed. And this goes to the title prong of domesticity and not the irrevocable liability. Now, it's important to understand when absolute activists, when they set forth a standard, they said they quoted Black's Law Dictionary as to what a transfer of property or title. And so the question is, was there a transfer of property or title in the United States? It's indisputed by the parties that when there is a transaction that flows through the Depository Trust Corporation, this transaction can only occur when there's a book entry made in a participant's account at the DTC in New York. So the title must transfer through New York. And as this Court knows, there's a process of making a transaction, a T1 through T3 process. That T1 through T3 process happens only in one place in a DTC corporation, New York. And furthermore, in a DTC transaction, there's a process called novation. And this is in the Reference Guide to Clearance and Settlement noted in our brief. Novation means that if I make a transaction with my colleague here, Mr. Lyman, on the day at midnight between T1 and T2, all of a sudden I'm no longer the counterparty to Mr. Lyman. The counterparty is the National Securities Clearance Corporation. They are legally the counterparty to every single transaction going through DTC. So the question is, is this a domestic transaction? How can it not be under the title? And really what defendants are saying is that the title or property somehow is not talking about beneficial ownership. Somehow that wasn't contemplated when you're talking about transferring title securities. The question is, the securities laws for decades, for nearly a century, are premised on transactions and beneficial ownership. When did all of a sudden it become irrelevant where transfer of beneficial ownership occurs? It can't be that all of a sudden the transfer of ownership is a domesticity. If we look at beneficial ownership for making that determination, there can be no dispute these are domestic transactions and any perceived complications in applying Morrison would be easily resolved. Let me turn then to the arguments regarding BASIC and Halliburton. Defendants have said that there's an inability by plaintiffs to proffer evidence of directionality. There's one word missing from both BASIC and Halliburton. It's the word direction. There's simply no requirement in BASIC or Halliburton direction. Instead, BASIC and Halliburton are premised on a common sense notion that in open and well-developed markets, news will impact prices. It was called, not by plaintiff's counsel, but by BASIC itself, common sense. The question is, has that common sense notion been affirmed here? Has it been met here? We're talking about Petrobras here, which was the fifth largest company in the world during the class period. It had over 50 analysts covering it. It had over 500 market makers. It had a market capitalization of nearly $16 billion during the class period. If this isn't an open and well-developed market, there is no open and well-developed market in the U.S. securities markets. Particularly with the 50 analysts, these analysts are making determinations. They're making buy and sell recommendations. They're making price targets. Those price targets are inherent in that is that they are anticipating that news will impact the price of the security. They make predictions based on the news that's going to come out. If these 50 of the largest institutions in the world are taking the bet financially that news will impact these securities, why is that not sufficient here with a security like Petrobras? That being said, in an exercise of abundance of caution, we did perform a Camera 5 test. That Camera 5 test, by statistical significance, showed that on days where there was more new information coming out than non-news days, earnings days we looked at, and days where there's a disclosure regarding corruption, there was a greater degree of statistically significant returns on those days compared to non-news days. It showed the sensitivity of price to news. Did the district court acknowledge that? Absolutely. It acknowledged Dr. Feinstein's test. It noted that this Z-test, as we call it, was actually noted in the reference manual for scientific evidence. It was noteworthy that the article was written by scholarly articles by the FDT, Frillo, Tabak, and Dunbar, and others. It's simply an analysis you do in any pharmaceutical situation. You look at pools of data and you see if there's a difference between those pools. If that difference is statistically significant, you've rebutted the null hypothesis. That's been done here. If defendants are complaining that Dr. Feinstein's test did not test directionality itself, the question first we say is where is that requirement? It's simply not articulated in any court in this circuit, and certainly in the Supreme Court. We had directionality in this record, Your Honor. We have abundant evidence of directionality. As noted in our brief, seven of the ten largest statistically significant price declines were in the alleged corrective disclosures. What does that tell us? When bad news comes out, Petrobras stock goes down. We have directionality. Check. Then, with respect to the corruption events, which were tested by Dr. Feinstein, every single statistically significant corruption disclosure for the stocks and for the preferred securities, where there was a statistically significant reaction, it was always downwards. Once again, bad news came out. Petrobras stock went down. Why is there a need to now redo another test to try to fit it into defendants' very myopic view, ultimately, of directionality and absolute efficiency? There's simply no need, based on the common sense articulation of BASIC, by this court. We're really left with, when it comes to both of the issues raised by defendants, we're really left with, and BASIC itself established a standard, really, in order to address a problem, that it was ultimately going to be impossible to proceed with a class action if you didn't have a presumption. This isn't legislative history, as it were. That is specific in BASIC. We are doing this as a tool to facilitate class actions, and this tool accords with common sense. Didn't Judge Rakoff come short of finding directionality, the fifth factor, and basically said, with all these other indirect factors, common sense tells us that the fifth factor would exist. He didn't reach that conclusion himself, did he? The fifth factor is cause and effect. Does news impact stock price? He credited Dr. Feinstein's report, which tested that very fundamental notion. Defendants would like to have a camera six, which is directionality, but there is no camera six, which tests which direction it goes into, and that wasn't specifically tested by Dr. Feinstein. It certainly, though, is inherent in the entire record before this court and in the post hoc analysis by Dr. Feinstein. It's that if you looked at the news that came out, did the stock act appropriately, and in all instances Dr. Feinstein found it did. There were two instances where Dr. Feinstein had said that there was positive news, and where it actually turned out that Judge Rakoff found, no, that was not positive news, that was mixed news. That's hardly showing that directionality doesn't exist here. It shows, actually, overwhelmingly we've got directionality, and you could dispute on certain pieces of information whether or not news is positive or negative, and because of the fact that we have those disputes on whether news is positive or negative is a reason why directionality tests are very... Did Judge Rakoff affirmatively find causality in this situation? Well, there's no need for cause and effect, yes. Camera five was found. Camera five was met by the FDT test, the Z test. That's clear from the judge's order that that was found. He did a very thorough analysis of the Z test performed by Dr. Feinstein, and he found that plaintiffs had met their burden of showing that information impacts the share price of Petrobras securities. That is in dispute in the record. What's disputed is whether or not he had to show that it went in the right direction, and there's simply no requirement to do so. And what we're submitting is that even if the court would want evidence of that, we don't need to go back and do another test. We've got the evidence in the record. You look at the corruption dates when there were statistically significant reactions, and every time it went down. You look at the largest stock declines in the class period. Seven of the ten were corrective disclosures when they went down. So we've got the evidence. So ultimately defendants in both instances are really saying, we can't believe that they're saying you can never have a class certified over the counter market, and we can't believe they're saying you can't find directionality here. What they're really asking is to redo things and go back and reinvent the wheel. We think Judge Rakoff's wheels here are just fine and should be affirmed by this court. Mr. Kasner? Thank you, Your Honor. Got up a little bit too quickly there. Sorry. Your Honor, I will hew to the minute as best I can with respect to DTC. Five points, all in our brief. Number one, they didn't raise it to Judge Rakoff below why they had lost that issue on the motion to dismiss. Number two, they never cross-appealed from that decision on DTC. Procedurally, they couldn't do it. We've cited authority in our briefs that for this court to reach the issue would thereby expand Judge Rakoff's class certification decision and effectively give them relief that they didn't seek. Number three, this court in the Logovinskaya case squarely held beneficial ownership acquisition does not equal title for purposes of Morrison. So all of those reasons, plus the DTC has submitted an amicus brief, which I would commend to the court because I can't do this issue justice in a minute. The question, Your Honors, is was Judge Rakoff correct in certifying a class in domestic transactions? I heard a lot of evidence from my friend, Mr. Lieberman, particularly in response to Judge Livingston's questions. The dangers of having the evidence here through counsel's mouth rather than before the court at the district court level to make a decision is illustrated by the following. Counsel said, quote, this is a 95% institutional investor base. When we sought discovery on the trades from this 95% institutional investor base, plaintiffs resisted that successfully before Judge Rakoff at page A6051 of the record. And what did they say to Judge Rakoff? Quote, there can be no doubt that absent class members, many of whom are unsophisticated investors with little legal background and unfamiliar with the U.S. legal system. Well, either they're 95% institutional investors or many of them are unsophisticated, but either way, that was a record with respect that Judge Rakoff needed to have. Lastly, with respect to the issue of waiting until post-judgment claims processes, the vast majority of cases that this court confronts in the securities class action space has to do with securities that are traded in the United States where a person gets a confirmed slip, the class defines you as purchasers between A and B. You look at your confirmed slip. You know right then you're in. What happens after the case is over is you chit in in an administrative process that the courts, including the Third Circuit in the Newton v. Merrill Lynch case, which is in our paper, specifically draws the distinction between this mathematical calculation that gets made at the end of a class action and what we're talking about here. Defendants are entitled to take discovery of the institutional investors in Bahrain, in London, in Shanghai, and in Singapore who bought securities in over-the-counter transactions, dark pools, electronics, electronic media in order to determine did you assume irrevocable liability in the United States. That is the flaw in what Judge Rakoff did. Thank you, Your Honors. Thank you, Mr. Kasman. Mr. Lyman. Your Honors, quickly with respect to BASIC and then the 10B points with respect to Morrison. On BASIC, the court did not make findings with respect to directionality. In fact, it found that it couldn't make findings. That's S.P.A. 40 to 41. They rely upon common sense. That's not a legal standard. That's a rule. If that's the rule, it essentially results in giving an insurance policy to everybody who purchases a security of a large company to just go to court without any demonstration by them of reliance. And they also, there was a hint of a request for a redo. Well, you know, they've had their chance. They had plenty of chances with respect to this. We raised the issue of lack of directionality, and they didn't satisfy the burden on rebuttal to show directionality. There should be no remand with respect to BASIC. On the Morrison point, quickly, we didn't admit that the other cases were cases where there was domestic jurisdiction. In fact, we said we needed discovery with respect to those. Judgment claim process doesn't work for the reasons that Your Honor identified in Vivendi and that Henry Friendly identified long ago in Bursch. And when there's circumstances where the class is damaged thereby, those people are not going to be able to run off to the Netherlands like the plaintiffs in Fortis and other cases did and say, well, give us relief even though we lost in the southern district because we were damaged. They would be admitting they weren't damaged. Thank you very much, Your Honor. Thank you. Thank you all. Helpful argument. No. You can rely on us to think about these things. I've got two great colleagues who have already dealt with these things. Thank you all. Well, I mean, the arguments were very helpful, and we'll reserve decision, obviously, and I'll ask the clerk please to adjourn court. Court is adjourned.